JaWATKINS, Judge.
Plaintiff, Dr. Robert S. Miller, filed suit on an alleged employment contract, claiming entitlement to specific benefits upon termination of his employment by defendant, Louisiana Casino Cruises, Inc. (LCCI).
LCCI operates in Baton Rouge, Louisiana, under the trade name, “Casino Rouge,” and it is the owner of the riverboat and terminal by the same name. The owners of LCCI are Jerry Bayles, Dan Meadows, Tom Meehand, and Carnival Management Company, Inc.
*600 Mr. Bayles organized LCCI in August of 1991. At the same time, LCCI contracted with Market Research and Issues Management, Inc. (MRIM), Dr. Miller’s company, for the purpose of having Dr. Miller do consultant work on a part time basis. Dr. Miller worked as a consultant for LCCI until June 1, 1992. Thereafter, he began work as an employee of LCCI at a salary of $10,000.00 per month.[2] The focus of Dr. Miller’s work for LCCI was pursuing gaming licenses. The relationship between the above named individuals and companies continued until November 30, 1992, when Dr. Miller’s services and those of MRIM were terminated, pursuant to a letter signed by Mr. Bayles on behalf of LCCI.
Plaintiff filed suit against LCCI, claiming he was entitled to $60,000.00 severance pay, penalties and attorney fees under LSA-R.S. 22:631 et seq. for failure to pay the severance benefit, and payment of an “incentive benefit” of cash and common stock in the defendant corporation.
Finding there was a valid contract between the parties which encompassed the severance pay of $60,000.00, the trial court made that award. However, the trial court found that plaintiff was not entitled to penalties and attorney fees because the defendant company was not in bad faith in its failure to pay the $60,000.00; the trial court also denied plaintiff’s claim to stock in the riverboat company, finding that the provision for such in the agreement was not triggered because plaintiffs work with defendant ended a couple of years before the license was obtained by defendant.
|3Plaintiff appealed, seeking the penalty/attorney fees and the incentive payment of cash and stock. Defendant appealed, seeking a reversal of the judgment for $60,000.00, on the ground that there was never a meeting of the minds on the termination provision.
It is undisputed that the employment contract in its entirety was never finalized. However, the record contains the following agreement signed by the parties on October 22,1992.
The following are the basic terms for an employment agreement between Louisiana Casino Cruises, Inc. and Robert S. Miller. This should not be construed as the entire agreement but as a summary of the basic terms agreed to by the'parties. A formalized employment agreement shall follow, which will comply with Louisiana law concerning employment contracts including, but not limited to responsibilities and obligations of each party to the other party. Agreed to this 1st day of June, 1992 by and between Louisiana Casino Cruises, hereinafter referred to as “LCCI” and Robert S. Miller.
Basic terms of this document:
1) Effective June 1, 1992, a six month automatically renewing employment contract until the acquisition of at least two gaming licenses, thereafter the term will be for 24 months renewing every 24 months.
2) An initial salary of Ten Thousand and no/100 dollars ($10,000.00) per month. Salary to be reviewed annually based on performance, responsibilities and LCCI finances.
3) After the acquisition of at least two licenses and as established by the company, participation in LCCI’s life, health and disability insurance, pension and profit sharing and stock option programs as offered to other executives proportionately to salary.
4) Usual and customary business expenses reimbursement.
5) Licensing incentives to be paid on the following schedule:
Upon acquisition of a river boat license, a $150,000 per boat incentive will be paid; $15,000 in cash and $135,000 in stock at the initial offering price. Upon acquisition of the land-based casino, a $750,000 incentive will be paid, $50,000 in cash and $700,000 in stock at the initial offering price. Stock to be made available from the corporation *601 which holds the gaming license or in the case of the New Orleans casino either the land lease or gaming license. All stock may be restricted stock.
6) LCCI will pay $5,000 per month for overhead services associated with Market Research and Issues Management, Inc. until such time as LCCI terminates this additional service.
7) Billing made on LCCI’s behalf by Market Research and Issues Management, Inc., will be done directly with LCCI with no commission charge added.
148) All correspondence generated by Miller will be on LCCI letterhead or approved letterhead.
9) Miller’s position and specific duties to be assigned at a later date.
10) Memos detailing meetings attended by Miller will be provided to LCCI.
11) Termination provisions Equal to the value of item number one (1) up to $200,-000.
SEVERANCE PAY
Despite LCCI’s argument to the contrary, our examination of the record does not reveal that the trial court committed manifest error in its factual finding that there was a meeting of the minds concerning the provision for severance pay (Item No. 11) in the employment contract. Furthermore, although the trial judge implied that the provision was ambiguous, it is apparent he meant that Item No. ll’s reference to Item No. 1 was an awkward method of providing for the calculation of the severance pay, not that it was uncertain as to the obligation to pay.
Nor are we persuaded by defendant’s argument that the trial court erroneously interpreted the termination provision against defendant. The trial court merely found there was a meeting of the minds and then proceeded to decide what amount was owed. The trial court made an award equal to six months’ pay because the term for Dr. Miller’s employment had not reached the 24-month level provided as an alternative in Item No. 1. Because the trial court awarded the minimum amount pursuant to Item No. 1, we cannot agree with defendant that the provision was interpreted against defendant.
INCENTIVE PAYMENT OF CASH7STOCK
Dr. Miller claims he is entitled .to the “incentive payment” provided in Item No. 5 of the employment contract. His claim is limited to one “per boat” incentive of $150,-000 in cash and stock on the basis that that was the only license LCCI received. We find the provision in Item No. 5 to be ambiguous. Does “[u]pon acquisition of a river boat license” mean upon LCCI’s acquisition of the license at any time, or does it mean upon acquisition of the license during Dr. Miller’s tenure with LCCI?
Cognizant of the principle of contract interpretation that the contract should be read against the drafter, we nevertheless believe the paramount rule of ascertaining the intent ofj^the parties is controlling in this situation. References in other items of the contract convince us the parties intended the “acquisition” mentioned in Item No. 5 to be an acquisition of a license during the term of Dr. Miller’s employment with LCCI. Specifically, the six month or 24-month term of employment in Item No. 1 is dependent upon the acquisition of at least two gaming licenses; likewise, Dr. Miller’s right to participate in LCCI’s insurance plans, pension and profit sharing program, and stock option program was contingent upon the acquisition of at least two licenses. These emoluments of employment impliedly have reference to Dr. Miller’s responsibilities under the contract to assist LCCI in acquiring the licenses, not to LCCI’s eventual acquisition of the licenses by persons and means unrelated to Dr. Miller after his employment had ceased. We infer from the other provisions of the contract that the parties intended for the incentive payment to be due only if the license was acquired while Dr. Miller was employed.
Another approach to interpretation of the agreement for the incentive payment is Item No. 9, which provides that Dr. Miller’s “position and specific duties” would be assigned at a later date. This provision is a clear statement that there was never a meeting of the minds between the employer and *602 the employee concerning Dr. Miller’s responsibilities. We cannot conclude there was a meeting of the minds on the ambiguous provision for the incentive payment when the parties never agreed on the bases for those incentives.
Accordingly, we conclude the trial court was correct in denying plaintiffs claim for the payment of cash and stock as an incentive payment.
PENALTIES AND ATTORNEY FEES
The trial court denied plaintiff recovery of penalties and attorney fees pursuant to LSA-R.S. 23:631. The ease of Boudreaux v. Hamilton Medical Group, Inc., 94-0879 (La.10/17/94); 644 So.2d 619, is controlling. Therein, the court held that “compensation on termination” provided in the plaintiffs contract was not “wages” under the statutes; therefore, the defendant’s failure to pay the “compensation on termination” timely did not trigger the penalty/attorney fee obligation.
|fiThere is no distinction between the “compensation on termination” in Boudreaux and the “termination provision” of Item No. 11 in the instant case. Neither qualifies as “wages” under the statute.
Plaintiff cites Thomas v. Orleans Private Industry Council, 95-1577 (La.App. 4th Cir. 2/15/96); 669 So.2d 1275, writ denied, 96-0686 (La.4/26/96); 672 So.2d 671, as authority for the proposition that a “bonus” qualifies as wages under the statutes, despite the Bou-dreaux holding. However, because we have concluded that plaintiff is not entitled to “incentive pay,” the Thomas case is not on point here.
In light of the conclusions reached above, plaintiff is not entitled to attorney fees on appeal.
Accordingly, we affirm the trial court judgment in plaintiffs favor, and we assess the parties equally with costs of this appeal.
AFFIRMED.

. MRIM continued to be paid $5,000.00 per month under the original agreement, and MRIM provided Mr. Bayles with secretarial services.